**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**ERIC L. MILLER,**

       **Plaintiff,**

**v.**                            **Civil Action No.  3:14cv125**
                                       **(The Honorable Gina M. Groh)**


**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

       **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Eric L. Miller ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) for judicial review of the final decision of the defendant, Commissioner of the Social Security Administration ("Defendant," and sometimes "the Commissioner"), denying the Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act.  The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I.  PROCEDURAL HISTORY

Plaintiff filed an application for DIB on August 21, 2009, alleging disability due to degenerative disc disease, slipped discs, nerve damage, blood pressure, and arthritis as of February 13, 2009 (R. 135, 153).  Plaintiff's applications were denied at the initial and reconsideration levels (R. 71-75, 81-83).  Plaintiff requested a hearing, which Administrative Law Judge Maria Alexander Nunez ("ALJ") held on March 13, 2013, and at which  Plaintiff, represented by counsel, and Dr. Davis, Vocational Expert ("VE"), testified (R. 28-68, 85).  On June 6, 2013, the ALJ entered a

decision finding Plaintiff was not disabled (R. 10-22). Plaintiff appealed this decision to the Appeals Council, and, on October 2, 2014, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-4).

## II. FACTS

Plaintiff was born on August 2, 1971, and was forty-one (41) years old at the time of the administrative hearing (R. 33). He has a GED education, an EMT license, a fireman's license, an auto transfusionist license (relative to blood work), and a HAZMAT technician certification (R. 35). His past relevant work includes HAZMAT technician, ink man, EMT, factory worker, forest fireman, restaurant management, roadside assistance worker, farm equipment and truck repairman, crane operator, and sheet metal worker (R. 36-40).

Plaintiff's November 8, 2007 MRI of his lumbar spine showed disc desiccation with slight loss of height but no significant bulge at L1-2; mild disc bulge with mild bilateral neural foraminal stenosis at L4-5; and mild facet disease at L5-S1, with no significant disc abnormality (R. 217).

From August 2007 through December 2008, Plaintiff was treated by Dr. Yu and Dr. Whyte and at the QuadMed West Virginia Clinic, and he underwent physical therapy for low back pain (R 219-84). The records contain the following:

- Plaintiff slipped and fell in a "peacock cage" on August 6, 2007, and was treated for lumbar pain by Dr. Whyte with Naproxen and Flexeril (R. 240-43);

- His back pain continued and Dr. Whyte prescribed Ultracet on October 30, 2007, and Flexeril and Naproxen on November 12, 2007 (R. 244-51);

- His pain, which was "shooting," increased in April, 2008, and Dr. Whyte prescribed Flexeril, Naproxen, and Medrol (R. 252-56);

- Dr. Whyte prescribed Lortab to Plaintiff for back pain on April 17, 2008 (R. 256-59);

- Plaintiff had taken "2 instead of 1" Lortab "as directed," and, on April 21, 2008, Dr. Whyte did not refill Plaintiff's Lortab prescription as requested (R. 259-60);
- On April 24 and 28, 2008, Dr. Whyte prescribed Hydrocodone to Plaintiff for back pain (R. 261-63, 265-66);

- Dr. Whyte noted, on May 13, 2008, that Plaintiff had been medicating with eight-to-nine (8-9) Hydrocodone pills per day due to his work schedule and prescribed Hydrocodone for back pain (R. 267-68);

- Dr. Yu examined Plaintiff on May 15, 2008, and found Plaintiff was positive for "a mild form of guarded lumbar spine"; "mildly positive" straight leg raising test; "minimally positive" bowstring test; mild tenderness at L4-5; normal sensation; and normal need EMG results of both lower extremities and provided a nerve block (R. 741-42);

- Plaintiff was referred to Dr. Yu for pain management on June 3, 2008 (R. 260);

- On July 31, 2008, Plaintiff informed Dr Yu that he had increased back pain after standing at work for ninety (90) minutes; he had hiked for six (6) miles (R. 736);

- On September 3, 2008, Plaintiff informed Dr. Yu that he was "very uncomfortable with standing on his job for two or four hours"; he was "unable to stay at his current job"; he intended to go back to school (R. 735);

- On September 11, 2008, Plaintiff reported to Dr. Whyte that Dr. Yu had told him that he had "done all for him he could do" (R. 272);

- Plaintiff reported to Dr. Whyte on September 24, 2008, that his back pain was "'better than what it was'" following an injection, and Dr. Whyte prescribed Skelaxin (R. 2 73-76);

- Dr. Whyte wrote a letter to Plaintiff's employer on September 26, 2008, noting Plaintiff should not lift (R. 278-79);

- Dr. Whyte prescribed Hydrocodone to Plaintiff on October 2, 2008 (R. 280);

- Dr. Whyte prescribed Oxycontin for back pain and diagnosed hypertension on October 10, 2008 (R. 281-84);

- Dr. Whyte prescribed Oxycontin for back pain on October 21, 2008, November 6 and 26, 2008 (R. 285-91);

- Dr. Whyte prescribed Oxycontin for back pain on December 17, 2008, and Plaintiff stated the increased dosage of Oxycontin was working made him feel "much better" (R. 293-296);

- Plaintiff participated in physical therapy on December 29, 2008, and January 5, 8, and 12, 2009 (R. 298-305, 448-51).

On January 14, 2009, Plaintiff reported to Dr. Whyte that his physical therapy was "'going excellent.'" The injection gave him one (1) week relief from pain. This was the "best he's felt in the past 6 months." Plaintiff wanted to wean off Oxycontin because he was "physically addicted." His work had been "going well and he [did] not feel that the need[ed] any lifting restrictions" (R. 307). Dr. Whyte diagnosed high blood pressure and lumbar back pain. He prescribed Oxycontin (R. 308-09, 451-54). Dr. Whyte wrote to Plaintiff's employer that he had no lifting restrictions but should only perform repetitive motion tasks occasionally (R. 310, 455).

Plaintiff participated in physical therapy on January 15, 22, 26, and 29, 2009; February 9 and 12, 2009 (R. 310-17, 456-62).

Plaintiff presented to Dr. Whyte on February 18, 2009, with back pain. Dr. Whyte "submitted paperwor (sic) for a 6 week leave" from work. Plaintiff believed physical therapy was "helping." (R. 318). Plaintiff could fall asleep but not stay asleep. He was diagnosed with low back pain and insomnia and prescribed Oxycontin and Amitriptyline (R. 319-21, 464-66).

Dr. Whyte referred Plaintiff to Dr. Yu on February 19, 2009, for treatment (R. 216, 322).

Plaintiff participated in physical therapy on March 5, 2009 (R. 323-24, 468-69).

Plaintiff informed Dr. Whyte on March 12, 2009, that he no longer attended physical therapy due to worsening symptoms (R. 324). Dr. Whyte diagnosed low back pain and insomnia and prescribed Amitriptyline and Oxycontin (R. 326, 469-72).

Dr. Yu examined Plaintiff on April 2, 2009, for back pain. Dr. Yu noted Plaintiff had been diagnosed with "three degenerated discs with spurs of the lumbar spine." Dr. Yu further noted

4

Plaintiff had previously responded "well" to nerve root blocks and "medial branch blocks." He medicated with "pain medication through his primary car physician." Dr. Yu recommended Plaintiff undergo a radiofrequency rhizotomy (R. 215, 734).

Plaintiff presented to Dr. Whyte on April 3, 2009. Dr. Whyte noted Plaintiff's dosage for Oxycontin had been increased "last visit." Plaintiff had experienced a house fire and was "doing the finishing work himself." Plaintiff's back was "'tight', (sic) especially if he [didn't] do his stretches." Plaintiff did not plan to return to work after he underwent a radiofrequency rhizotomy (R. 328). Dr. Whyte refilled Plaintiff's prescription for Oxycontin (R. 329, 472-75).

Dr. Yu performed a radiofrequency rhizotomy on Plaintiff on April 28, 2009 (R. 213).

Dr. Whyte noted, on May 11, 2009, that the April 28, 2009, radiofrequency rhizotomy conducted by Dr. Yu was "cut short mid-way through because [Plaintiff] was 'uncomfortable' and declined to proceed." Plaintiff was terminated from his job (R. 332, 732). Plaintiff was less stressed now that he was not working. Plaintiff's back was "'very tight,'" but "[a] couple of his neighbor's Xanax did help him." Dr. Whyte refilled Plaintiff's prescription for Oxycontin (R. 332-35, 477-80).

Plaintiff was treated by Dr. Whyte on June 11, 2009. Plaintiff reported his symptoms were "'the worst [he had] felt in about 3 months'" He walked and curled five (5) pound dumbbells with his arms (R. 342). Dr. Whyte increased Plaintiff's Oxycontin dosage (R. 344-45, 487-90).

Plaintiff's June 12, 2009, laboratory tests showed low thyroid function (R. 494-95).

Plaintiff reported to Dr. Whyte on June 30, 2009, that he was an "emotion wreck and that he often [found] himself 'busting out bawling.'" His mother died in 2003, and he still possessed her cremated ashes. He intended to drive to Florida on July 17, 2009, to scatter her ashes. He had racing thoughts and slept between two-to-four (2-4) hours per night. He had flashbacks of a gunshot injury

from his past; he had begun remembering his incarceration in a maximum security prison. He had medicated these symptoms with Xanax, which he had gotten from a "friend" (R. 351). He asked Dr. Whyte for something that would "'knock [him] out.'" His back pain had improved, but he continued to have "good days and bad days." Dr. Whyte "offered counseling," but Plaintiff "declined." He prescribed Trazodone, Oxycontin, and Glucosamine-Chondroitin (R. 352-54, 496-99).

On July 7, 2009, Plaintiff was treated by Dr. Whyte for insomnia. Plaintiff stated he felt "much better" and more like his "normal self" due to medicating with Zolpidem. Plaintiff planned to travel to Florida on July 8, 2009 (R. 358). Plaintiff's mood and affect were normal. Plaintiff was diagnosed with hypothyroidism, Hashimoto's thyroiditis, hypertension, insomnia, and low back pain (R. 360). Dr. Whyte prescribed Lisinopril and Oxycontin (R. 361, 502-06).

On August 3, 2009, Plaintiff reported to Dr. Whyte that Oxycontin was "not working as well anymore after driving round trip to" Florida. He believed the "long car [trip] aggravated his back pain." He "ran" out of Oxycontin by taking it more often than prescribed. He had good days and bad days. Zolpidem "continue[d] to work wel (sic) for him"; he "ocasionally (sic) [took] a second pill if he [woke] in the middle of the night." His blood pressure readings were "improved"; however, the Lisinopril caused erectile dysfunction (R. 363). Plaintiff signed a "chronic pain contract." Dr. Whyte discussed Plaintiff's weaning off Oxycontin "in an attempt to get off them entirely or decrease his dose significantly so as to make it easier to find a treating physician in the future" (R. 365). Dr. Whyte prescribed Oxycontin (R. 366, 508-11).

Plaintiff reported to Dr. Whyte on September 2, 2009, that he had been taking Oxycontin as prescribed, and it was "working well for him" (R. 372-73). Plaintiff's rapid drug screen test was negative opiates, and Dr. Whyte could "not explain why" and expected "that he would have tested

6

positive for opiates" (R. 374). Plaintiff's TSH level was "down"; his blood pressure was "elevated" (R. 375). Dr. Whyte prescribed Oxycontin (R. 375-76, 517-21).

Dr. Whyte informed Plaintiff on September 9, 2009, that his rapid drug screen was positive for Oxycontin, the level for which was below the threshold. Plaintiff informed Dr. Whyte he had been "doing well in the interim" and not misusing his prescription medications. Plaintiff, however, had not been taking his Lisinopril because of erectile dysfunction. He had not been regularly monitoring his blood pressure (R. 380). His low back condition had been unchanged; his blood pressure was elevated. Dr. Whyte prescribed Lisinopril and Oxycontin (R. 381-82, 524-27).

On September 21, 2009, Dr. Whyte completed a Restriction Form wherein he opined Plaintiff was not able to work, had "failed attempts at light duty," and sitting exacerbated his pain (R. 743).

On October 9, 2009, Plaintiff informed Dr. Whyte that "'[b]oth sciatics [had] fired up bad." Heat worsened the pain (R. 529). Dr. Whyte diagnosed chronic low back pain for which he prescribed Promethazine, Gabapentin, Oxycontin, and Oxycodone and hypothyroidism for which he prescribed Lisinopril and Gabarone (R. 530-31).

Dr. Franyutti submitted a Physical Residual Functional Capacity Assessment of Plaintiff on October 24, 2009. It was incomplete because Plaintiff did not return the forms or respond to messages or letters. There was "isufficient" medical evidence for the RFC (R. 388-95).

Plaintiff informed Dr. Whyte, on October 30, 2009, that his pain level was six (6). Plaintiff stated it was "maybe . . . time to do another MRI" (R. 533). Plaintiff reported he experienced a "vibrating sensation in right hip radiating down to right foot." Plaintiff's worsening pain caused sleeping difficulties. His low back pain was constant and interrupted his sleep. Plaintiff could not be active as a scout leader for his son. Plaintiff reported he had experienced "[n]o change" when

medicating with Gabapentin (R. 418). Upon examination, Dr. Whyte found Plaintiff had tenderness of his right lumbar paraspinal muscles. His motor examination and strength were "normal" throughout. His reflexes were normal, except for decreased knee jerk on the right. His sitting straight leg raising examination was "negative bilaterally." Plaintiff stated that Oxycontin IR was more effective. Dr. Whyte prescribed Oxycontin (R. 419-20, 533-36).

Plaintiff's November 6, 2009 MRI of his lumbar spine showed a disc bulge at L4-5, causing "mild bilateral neural foraminal stenosis, unchanged from prior study" (R. 396).

Dr. Whyte wrote to the Spine Center and Center for Pain Management on November 9, 2009, that Plaintiff had injured his back in 2007 when he fell in a peacock cage and then "drove his car off a 25 foot bridge going about 70 mph and aggravated the lower back again." Dr. Whyte detailed Plaintiff's treatment for his condition and recommended Plaintiff as a patient (R. 407, 545-46).

Dr. Whyte treated Plaintiff on December 9, 2009, for back pain and hypertension. Plaintiff reported he had good and bad days and muscle spasm. He had "not yet scheduled an appointment to see The Spine Center and Center for Pain Management" because he was "busy" securing a lawyer to pursue his Social Security case. He could fall asleep, but not remain asleep (R. 402). He had not medicated with Zolpidem in one-to-two (1-2) months (R. 413). He wanted the Oxycontin dosage increased because of worsening back pain; Gabapentin did not "help." He had decreased activity but was "still somewhat active with his son's scout troop" (R. 413). Plaintiff smoked one-fourth (1/4) package of cigarettes per day (R. 403). Upon examination, Dr. Whyte found Plaintiff was alert and cooperative and his mood, affect, and concentration were normal. Dr. Whyte prescribed Oxycontin, Zolpidem, Triamterene, and Cyclobenzaprine (R. 404-05, 415-16, 537-41, 548-51).

On January 8, 2010, Plaintiff presented to Dr. Whyte for back pain (R. 552). The prescribed

medication to treat insomnia was not effective. He had been doing "pretty good" during the past few days; he had been "trying to get out of bed and be more active." He was dieting and drinking less alcohol (R. 553). Dr. Whyte "[c]ommended" Plaintiff for "being more active" (R. 554). He prescribed Oxycontin, Oxycodone, and Hydroxyzine (R. 554-55).

Dr. Loev, a doctor at the Spine Center, conducted a consultative examination of Plaintiff on January 20, 2010. Plaintiff described his pain as "moderate to severe, nearly constant with no typical temporal pattern." It was a "burning, sharp, throbbing sensation in the lumbosacral axial spine . . . with occasional radiation to the posterior hamstring." He was grossly fatigued. Plaintiff could walk two-to-three (2-3) blocks. He would often lie down during the day. Plaintiff stated he had difficulty performing household chores and yard work and partaking in exercise and recreational activities. Plaintiff reported he had undergone "numerous injection[s] . . . by Dr. Willie Yu including apparent epidural injections, diagnostic facet tests, and attempted radiofrequency denervation." Plaintiff reported physical therapy, exercise, heat, ice, and chiropractic manipulations failed to ease his symptoms. He medicated with a "very high dose of opiod medications"; specifically Oxycontin and Oxycodone (R. 697). Plaintiff reported he had difficulty sleeping. He smoked less than one (1) package of cigarettes per day. Upon examination, Dr. Loev found Plaintiff's blood pressure was 126/64. He was in no acute distress. He had full range of lumbar axial motion, "but lumbar extension beyond 20 degrees [did] cause concordant axial pain." Plaintiff's lumbar flexion was "full to 90 degrees." His motor strength, sensation, and reflexes, throughout, were intact. Dr. Loev reviewed a lumbar MRI and his "differential diagnoses" were as follows: "L4 through S1 facet arthropathy, right greater than left"; spinal stenosis at L4-L5; right intermittent L4 radiculopathy; hypertension; and depression (R. 698). Plaintiff informed Dr. Loev that, even though the medication

"provide[d] some relief, he [was] still impaired." Dr. Loev told Plaintiff he was "not . . . willing to take over his chronic, high dose opiod medications in the face of his benign pain syndrome and continued disability"; however, he informed Plaintiff that "radiofrequency denervation [was] guaranteed to provide relief from facet arthropathy" and offered to repeat the procedure for him. Plaintiff agreed to the procedure (R. 699).

Dr. Reddy completed a Physical Residual Functional Capacity Assessment of Plaintiff on January 21, 2010. Dr. Reddy found Plaintiff could occasionally lift and or carry up to fifty (50) pounds; frequently lift and/or carry up to twenty-five (25) pounds; stand and/or walk for about six (6) hours in an eight (8) hour workday; sit for a total of about six (6) hours in an eight (8) hour workday; and push/pull unlimited (R. 432). Dr. Reddy found Plaintiff could frequently climb ramps and stairs and balance; he could occasionally climb ladders, ropes, and scaffolds and kneel, crouch, stoop, and crawl (R. 433). Plaintiff had no manipulative, visual, or communicative limitations (R. 434-35). Dr. Reddy found Plaintiff should avoid concentrated exposure to vibration and hazards, but he could be exposed to extreme cold, heat, wetness, humidity, noise, fumes, odors, dusts, gasses, and poor ventilation on an unlimited basis (R. 435). Dr. Reddy based her findings on the September 3, November 6, October 30, and December 9, 2009, medical notes of Dr. Whyte. Dr. Reddy also noted Plaintiff, according to his October 26, 2009, Adult Function Report, could perform light housework, shop in stores once weekly, and shower. Pain affected his sleep; he had difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and climbing stairs (R. 438).

On February 8, 2010, Dr. Whyte reviewed the findings by the doctor at the Spine Center and Center for Pain Management (R. 557). The Spine Center and Center for Pain Management doctor opined that, "with a diagnosis of facet arthropathy, radiofrequency denervation should be guaranteed

to provide relief." Plaintiff reported his symptoms were "about the same." His right lower back felt as if it was "being torqued with a ratchet" (R. 558). Plaintiff's lumbar forward flexion was "full 45-60 degrees" and hyperextension was "20 degrees." He had no sciatic notch tenderness (R. 559). Dr. Whyte prescribed Oxycodone and Oxycontin (R. 560).

On February 24, 2009, Dr. Whyte completed a Restriction Form wherein he opined Plaintiff was not able to work, had "failed attempts at light duty," and sitting exacerbated his pain (R. 744).

Dr. Whyte noted, on March 10, 2010, that he had reduced Plaintiff's dosage of Oxycontin to "wean" him off the drug; however, his pain worsened and he requested an increased dosage be prescribed. He smoked one-half (½) package of cigarettes per day. Plaintiff asked to "try" Gabapentin for sleep (R. 562). Dr. Whyte found Plaintiff's back condition had "deteriorated." He prescribed Gabapentin and Oxycodone (R. 564-65).

Plaintiff informed Dr. Whyte, on March 29, 2010, that he was nauseous, which was caused by Promethazine. Plaintiff discussed changing pain medication due to the cost of Oxycontin (R. 566). Plaintiff's examination was normal (R. 567). Dr. Whyte prescribed morphine sulfate (R. 568).

On April 7, 2010, Plaintiff phoned Dr. Whyte's office and reported diarrhea. He refused to see another medical professional because that individual could not "give him his pain meds. He stated that Dr. Whyte [was] going to have to change his pain meds, they are not working." Plaintiff stated "he would come and sit in this lobby all day until" the doctor could "work him in" (R. 569). Dr. Whyte noted Plaintiff had developed diarrhea due to morphine sulfate; however, the drug worked "well" for "about 4 hrs" (R. 570). Dr. Whyte's examination of Plaintiff was normal. He opined he did not "feel that his diarrhea [was] a side effect of his morphine sulfate" and ordered abdominal x-rays. He prescribed morphine sulfate (R. 572).

Plaintiff telephoned Dr. Whyte on April 23, 2010, and informed him morphine sulfate was "not helping" and he wanted a prescription for Oxycontin for pain and Levitra for erectile dysfunction. Dr. Whyte prescribed Levitra, Oxycodone, and Oxycontin (R. 576).

On April 28, 2009, Dr. Whyte completed a Restriction Form therein noting Plaintiff was not able to work, had "failed attempts at light duty," and could not sit for long periods of time (R. 745).

On May 6, 2010, Plaintiff told Dr. Whyte that he was "pain[]free" and felt "great." His examination was normal. Dr. Whyte prescribed Oxycontin, Levitra, and Oxycodone (R. 577-80).

On June 4, 2010, Plaintiff presented to Dr. Whyte with improved abdominal pain and worsening back pain, which he attributed to "caring for a close friend," and which included preparing meals, house cleaning, and grocery shopping. He reported right lower extremity radicular pain (R. 580-581). His examination was normal. Dr. Whyte prescribed Oxycodone and Oxycontin (R. 582).

Plaintiff telephoned Dr. Whyte's office on June 28, 2010, and advised his staff that he wanted to "get off" of his pain medication "completely" (R. 583). It no longer "seem[ed] to be helping his pain." He felt "down because he spends so much money on insurance . . . and the medication . . . doesn't help." Dr. Whyte prescribed Cymbalta and Oxycodone and referred Plaintiff to Shenandoah Community Health Center "to discuss Suboxone" (R. 584).

On July 1, 2010, Dr. Whyte was informed, by a staff member at Shenandoah Community Health Center, that the facility did not "do pain management" and the physician did "not prescribe Suboxone" (R. 587).

Plaintiff informed Dr. Whyte, on July 5, 2010, that he had "researched Suboxone and [did] not [want] to be on that." His pain was significantly worse. On July 4, 2010, Plaintiff depleted a prescription of Oxycodone which should have lasted until July 17, 2010 (R. 587). Plaintiff's

examination was normal. Dr. Whyte opined Plaintiff would not "ever . . . be able to be off of pain medication entirely and have any quality of life due to his chronic back pain." Dr. Whyte planned to wean Plaintiff from Oxycontin to Oxycodone; he informed Plaintiff he would no longer refill prescriptions early. He prescribed Oxycodone (R. 589).

Plaintiff asked Dr. Whyte for additional Oxycodone because he had been "miserable all month and believe[d] he ha[d] dropped too much in his dosing at once with the weaning plan." Dr. Whyte prescribed Oxycodone (R. 590).

Plaintiff was treated by Dr. Whyte on July 29, 2010, for back pain. Plaintiff stated he did not "feel that he [was] going to be able to wean off the pain medications." Plaintiff reported "balance issues" (R. 591). Plaintiff's examination was normal. Dr. Whyte completed a physical capacity evaluation for Plaintiff's lawyer. He prescribed Oxycontin and Oxycodone (R. 593).

Dr. Whyte completed a Physical Capacities Evaluation of Plaintiff on August 2, 2010. He found Plaintiff could stand and/or walk for two (2) hours in an eight (8) hour workday and sit between two-to-three (2-3) hours in an eight (8) hour workday. Dr. Whyte found Plaintiff could use his hands for simple grasping but not for pushing, pulling, and fine manipulation (R. 441). Plaintiff could not use his lower extremities for repetitive movement; he could not reach above shoulder level. Dr. Whyte found Plaintiff could occasionally lift up to ten (10) pounds and never lift from eleven (11) to anything over fifty (50) pounds; Plaintiff could occasionally bend, squat, crouch, and kneel; he could never crawl, climb, or balance (R. 442). Dr. Whyte found Plaintiff should avoid concentrated exposure to extreme cold and heat, humidity, and noise; he should avoid even moderate exposure to vibration, fumes, odors, dusts, gases, and poor ventilation; he should avoid all exposure to wetness and hazards (R. 443). Dr. Whyte found Plaintiff had the residual functional capacity to

do sedentary work for four (4) hours in an eight (8) hour workday. He could not perform light work (R. 444). Attached to the form was a statement by Dr. Whyte relative to Plaintiff's condition. Dr. Whyte wrote that Plaintiff had injured his back when he fell at work and then reinjured it when he "drove his car off of a 25 foot bridge going about 70 mph." Physical therapy provided no relief; he had realized "some improvement" with chiropractic therapy but had to stop it due to insurance. Plaintiff's radiofrequency ablation was not completed; he medicated with Oxycodone (R. 445).

Plaintiff requested medication for nausea on August 19, 2010; Dr. Whyte prescribed Promethazine (R. 594).

On August 24, 2010, Plaintiff presented to Dr. Whyte with nausea and vomiting. He stated both occurred when he medicated with Oxycontin and wanted to "get off" that medication (R. 595). Plaintiff's examination was normal. Dr. Whyte offered to refer Plaintiff to an employment assistance program and Plaintiff stated he would "think about it." Dr. Whyte prescribed Gabapentin and Oxycodone (R. 597).

Plaintiff reported to Dr. Whyte on September 8, 2010, that he had "done well" medicating with Oxycodone IR and his "pain control [was] adequate." He no longer had nausea or vomiting. Plaintiff had right shoulder pain and it made a grinding noise. He had no numbness, tingling, or weakness (R. 599). Plaintiff's physical examination was normal. Plaintiff's right shoulder range of motion was normal; his strength was 5/5 (R. 600). He was positive for subacromial space and traps tenderness. Dr. Whyte diagnosed low back and shoulder pain, which he "suspect[ed] [was a] degenerative condition." Dr. Whyte prescribed Oxycodone (R. 601).

On September 22, 2010, Dr. Whyte reviewed Plaintiff's right shoulder x-ray, which was within normal limits. His cervical x-ray showed narrowing of disk space, cervical spondylosis and

encroachment of the neural foramina, and plate sclerosis. Plaintiff reported right shoulder pain with radiation to elbow and difficulty sleeping due to leg pain (R. 604). Plaintiff agreed to participate in physical therapy (R. 605). Dr. Whyte prescribed Diazepam for sleep (R. 606).

Plaintiff participated in physical therapy on September 23, 2010 (R 606-10).

On September 27, 2010, Plaintiff presented to Dr. Whyte with complaints of back pain due to having fallen over a bench and a left wrist burn he experienced when he was cooking (R. 611). Plaintiff's back pain had increased and he had taken more than the prescribed dosage of Oxycodone (R. 612). Plaintiff had tenderness "just left of spine at L2-4"; forward flexion range of motion at thirty (30) degrees; no sciatic notch tenderness. Plaintiff's gait was "stooped forward as he [got] up from chair and then gradually straighten[ed] up." He had spasm at L2-4 (R. 613). Plaintiff had diminished strength in his left, lower extremity. Dr. Whyte prescribed Oxycodone (R. 614).

Plaintiff participated in physical therapy on September 28, 2010 (R. 614-16).

Plaintiff presented to Dr. Whyte on October 11, 2010, with low back pain. Plaintiff reported the only housework he performed was loading and unloading the dishwasher. He read and watched history programs on television. He was "very bored." Plaintiff reported his neck and right shoulder pain was "better" (R. 617). Plaintiff's examination was normal. Dr. Whyte diagnosed chronic low back pain and cervical spondylosis with radiculopathy. He "continue[d] to have need for increased pain medication" due his fall (R. 618-19). Dr. Whyte prescribed Oxycodone and Diazepam (R. 619).

Plaintiff participated in physical therapy on October 12 and 18, 2010 (R. 620-21, 622-23).

On October 25, 2010, Plaintiff presented to Dr. Whyte for low back pain. Dr. Whyte noted Plaintiff's dosage of Oxycodone had been increased due to a fall (R. 623). Plaintiff had been "doing well over the past few days." Diazepam had "helped a great deal for his sleep" (R. 624). Plaintiff's

physical examination was normal as to his lungs, heart, and psychiatric condition. Dr. Whyte, at Plaintiff's suggestion, ordered that he wean himself from ten (10) Oxycodone to six (6) pills a day, diagnosed low back pain, and prescribed Oxycodone (R. 625). Dr. Whyte noted Plaintiff's hypertension was "borderline" (R. 626).

Plaintiff informed Dr. Whyte, on November 16, 2010, that he had been arrested that date for domestic battery, which was his second offense. Plaintiff reported he had been living with his ex-wife, who was the alleged victim of the battery. She worked from 10:00 p.m. until 7:00 a.m., and he was responsible for "getting the kids off to school, taking care of the household chores (everything but the dishes)" (R. 635). Plaintiff reported that, during the altercation, he had taken his ex-wife "down to the ground," which led to the domestic battery charge. After the incident and before the police arrived, Plaintiff drank "a couple of 'big swigs' of vodka" to "calm his nerves." Plaintiff stated, when he returned to the residence when he was released from jail, that his money and his medications were gone. Plaintiff requested an antidepressant medication and additional pain medication be prescribed (R. 636). Dr. Whyte diagnosed depression, anxiety, and low back pain; he prescribed Citalopram, Oxycontin, Diazepam, and Promethazine (R. 638).

Plaintiff reported to Dr. Whyte, on November 24, 2010, that he could not recall the events of the domestic violence incident, except he had pushed his ex-wife against the passenger door as he drove her home from work and he had been "lying on top of" her on the kitchen floor (R. 639). Dr. Whyte encouraged Plaintiff to wean down his dosage of Oxycodone; he prescribed Oxycodone. He decreased Plaintiff's dosage of Diazepam (R. 642).

On December 1, 2010, Dr. Whyte was informed by an individual at "SVBHS" that Plaintiff should have an in-patient evaluation due to the domestic violence incident, his amnesia relating

thereto, and his "pain dependence issues." Plaintiff was instructed by Dr. Whyte to make appointment for December 2, 2010.

It was noted, on December 2, 2010, that Plaintiff was told he was not a candidate for inpatient evaluations, but he "could get a 01/17/2011 appointment with a psychiatrist" (R. 645). Plaintiff had contacted doctors to whom Dr. Whyte had referred him, but none accepted him as a patient. Dr. Whyte informed Plaintiff that Fast Track Anesthesia would be contacting him about transferring his care to that organization; however, Plaintiff would have to "be willing to wean pain meds and work on other modalities to relieve his pain." Plaintiff stated he "certainly would [be willing] and he could do without his pain meds as long as he ha[d] a provider and [did not] lose his disability payments" (R. 646). Dr. Whyte referred Plaintiff to Fast Track Anesthesia (R. 647-48).

Plaintiff established care with Dr. DeLanoy on December 15, 2010. Plaintiff informed Nurse Practitioner Shetley ("N.P.") that his back "problem" was stable but occurred "persistently." His low back pain radiated to his thigh. He described his pain as "ache and shooting." His symptoms were aggravated by sitting, standing, and walking and were relieved by taking pain medications. Plaintiff needed to "be moving at all times." Plaintiff reported his depression was in remission due to use of Cymbalta. He was experiencing irritable mood and fatigue (R. 692). Plaintiff slept for four (4) hours per night. He woke twice, sometimes due to back pain (R. 693). Plaintiff was positive for depression, insomnia, mood swings, and suicidal ideation. He had no joint symptoms, muscle weakness, myalgias, neck stiffness, and weakness (R. 694). He had no back tenderness; however, Plaintiff reported his pain was "deep" (R. 695). Plaintiff was counseled on ways to manage stress and prescribed Lisinopril-Hydrochlorothiazide, Trazodone, and Cymbalta. He was referred to a pain clinic (R. 696).

Plaintiff was treated by Dr. Whyte on December 23, 2010 (R. 649). Plaintiff had cancelled his December 29, 2010, appointment with a psychiatrist because he could not "afford to pay the office visit charge." Plaintiff reported his mood had "improved" with Citalopram; he was more positive and focused. Plaintiff stated he had "tried to back off with pain meds," but he "just [lay] around and is limited functionally with less medication." Plaintiff had not been able to secure a new primary care physician, which he needed to do because his COBRA coverage ended on January 12, 2011. Plaintiff stated N.P. Shetley had prescribed Trazodone for his sleep, which worked "great," but she could not prescribe Oxycodone, which was a drug he needed the new primary care physician to prescribe (R. 650). Dr. Whyte told Plaintiff he would continue to assist Plaintiff in his efforts to "find a doctor to prescribe his oxycodone." Plaintiff reported his depression and anxiety were improved. He prescribed Diazepam and Oxycodone (R. 652).

Plaintiff telephoned Dr. Whyte on December 28, 2010, and reported he had "totalled (sic) his truck." He requested Dr. Whyte to prescribe additional Oxycodone. He had struck a telephone pole while driving and "snapped it in half. The leaf spring in his truck snapped and threw him off the road. He [was] still hurting pretty bad." Plaintiff went to the emergency department at Jefferson Memorial Hospital; the treating physician would not prescribe additional pain medication. Dr. Whyte prescribed Oxycodone (R. 654).

Plaintiff telephoned Dr. Whyte on January 27, 2011, and informed him that he had not "found a doctor to prescribe his oxycodone" and he had four (4) pills left. He had taken one (1) pill per day, which made him "more limited in his activities and functioning . . . ." Plaintiff stated he "believe[d] he [could] function without them, but it [would] take some adjusting." Dr. Whyte encouraged Plaintiff to "develop some hobbies that bring him joy and satisfaction and that would partially help

to fill the void of pain medication." Plaintiff reported he was no longer receiving disability income from Liberty Mutual Insurance (R. 656). Dr. Whyte clarified that he had informed an individual at Medical Consultants Network, relative to Plaintiff's work, that he was restricted "on heavy machinery, climbing ladders, or being on elevated heights such as rooftops" due to chronic back pain and limited stability (R. 657).

Plaintiff telephoned Dr. Whyte on January 31, 2011, relative to Liberty Mutual Insurance disability benefits. He told Dr. Whyte that he had no Oxycodone and had a difficult time "getting up and around"; he did not have a doctor who could prescribe the medication (R. 657).

In a February 3, 2011 telephone call with a Liberty Mutual claims agent, Dr. Whyte "clarified" his opinion that Plaintiff required "restrictions based on his chronic pain and secondary functional limitations" and was "not able to work" (R. 658). In a letter dated February 15, 2011, to Liberty Mutual Insurance, Dr. Whyte reiterated the above opinions (R. 660-61).

Plaintiff reported "deep and piercing" back pain to N. P. Shetley on February 10, 2011. Plaintiff had lost his insurance and "need[ed] a letter stating he [was] unable to r/t work at this time." Plaintiff reported depression. He stated "financial worries," unemployment, and "stress at home" contributed to depression. He felt anxious and had fearful thoughts, irritable mood, and sleep disturbances. Plaintiff requested refills of his prescription medication. He was "[f]eeling better but not improved enough for satisfaction." N. P. Shetley noted Plaintiff had been diagnosed with degenerative disk disease, fatigue, hypertension, insomnia, and hypothyroidism (R. 689). N. P. Shetley found Plaintiff was positive for psychiatric symptoms and back pain; however, he was negative for back tenderness. He had no joint symptoms, muscle weakness, myalgias, or neck stiffness. His blood pressure was 119/82. N. P. Shetley recommended Plaintiff not "stay in one

position for long period of time" and avoid lifting. A "work note given to that effect" (R. 690). N. P. Shetley prescribed Cymbalta, Lisinopril-Hysrochlorothiazide, and Trazodone (R. 691).

Plaintiff informed Dr. DeLanoy, on March 2, 2011, that he had been compliant with taking his medication as prescribed. His depression had improved. His temper was better. He had intermittent depression. He had difficulty sleeping and had no energy. Plaintiff rated his constant back pain as a seven (7) on a scale of one-to-ten (1-10). Plaintiff was not medicating with any pain medication; he had weaned off Percocet and Oxycontin. He had been "'stretching out 30 mg percs"; he had taken one-hundred eighty (180) per month. He spent fifteen-to-sixteen (15-16) hours lying down. His balance was poor. He had to stop while performing housework, such as vacuuming. Dr. DeLanoy noted Plaintiff had the following chronic problems: degenerative disk disease, fatigue, hypertension, depression, insomnia, and hypothyroidism. Plaintiff was married (R. 686). Plaintiff smoked less than one (1) package of cigarettes per day. Plaintiff reported decreased appetite, depression, mood swings, psychiatric symptoms, sleep disturbances, and myalgias (R. 687). Plaintiff was positive for posterior tenderness and lumbar spine tenderness. Dr. DeLanoy prescribed Oxycodone, Cymbalta, Lisinopril-Hydrochlorothiazide, and Trazodone (R. 688).

In a March 2, 2011, letter addressed to the claims division of Liberty Mutual Insurance, Dr. DeLanoy wrote that Plaintiff was permanently disabled due to chronic lumbar disc disease (R. 447).

On March 11, 2011, Plaintiff requested that De. DeLanoy write a letter to his insurance company relative to his limitations. Plaintiff performed light housework, he could lift a bag of light groceries, he was not able to vacuum "some days" (R. 684).

On March 31, 2011, Plaintiff informed Dr. DeLanoy that his pain level was five (5) on a scale of one-to-ten (1-10). He had difficulty sleeping. He requested "increase in Percocet to help with

sleep issues"; two (2) Percocet pills per night caused him to sleep "better." Plaintiff's back hurt for one-to-two (1-2) hours and then "more at night." Plaintiff had been "trying to work in wood shop." Plaintiff had not taken his blood pressure medication for two (2) months. Cymbalta was "effective." Plaintiff smoked less than one (1) package of cigarettes per day (R. 681). Plaintiff's blood pressure was 128/74. Plaintiff's examination was normal, except he had decreased flexion and extension. Dr. DeLanoy prescribed Cymbalta, Restoril, and Oxycodone (R. 682).

On May 26, 2011, Plaintiff informed Dr. DeLanoy that he had been medicating with Oxycodone. It had "been effective." Plaintiff's pain was six (6) on a scale of one-to-ten (1-10). Plaintiff reported impaired balance. He had fallen "about three times when he" was "walking and making a turn." Plaintiff had joint pain in his hands; playing the guitar "helped." Plaintiff reported that standing "too long" exacerbated his pain. He performed light housework. Plaintiff reported that Temazapam had been effective in treating his depression. He felt mentally "better" and was getting "a good night's sleep." Plaintiff smoked less than one (1) package of cigarettes per day (R. 678). Plaintiff's examination was normal, except he was positive for posterior tenderness, bilateral tenderness from L4 to S1, and decreased flexion and extension (R. 679). Dr. Delanoy prescribed Oxycodone, Restoril, and Cymbalta (R. 680).

On August 22, 2011, Plaintiff reported to Dr. DeLanoy that he had increased pain in his right leg and right hip tingling. He had "taken a few extra pain pills due to pain" caused by his having to "fix a sewer line." Plaintiff stated that his pain medication seemed to be working "[o]verall." Dr. DeLanoy noted Plaintiff's chronic problems were degenerative disk disease, fatigue, depression, insomnia, and hypothyroidism (R. 676). Upon examination, Plaintiff was positive for posterior tenderness, lumbar spine tenderness, and "mild" pain with motion. Plaintiff's straight leg raising

test was negative. Dr. DeLanoy prescribed ten (10) extra pills to Plaintiff so he could "break in half for breakthrough pain." She prescribed Restoril, Cymbalta, and Oxycodone (R. 677).

Plaintiff presented to Dr. DeLanoy on November 14, 2011, with complaints of hoarseness. His stress and anxiety levels were "high" because he had just separated from his wife. Plaintiff described his back pain as sharp. His pain level was four (4). Plaintiff reported his balance had been "off" and he had right toe numbness. He experienced burning pain in his low back. Restoril was not "fully effective" in treating Plaintiff's insomnia. Plaintiff smoked less than one (1) package of cigarettes per day (R. 673). Plaintiff was positive for paravertebral muscle spasm and posterior tenderness. His affect was normal. Dr. DeLanoy prescribed Cymbalta and Restoril and instructed Plaintiff to return in three (3) months (R. 674).

On February 15, 2012, Plaintiff informed Dr. DeLanoy that his depression was well controlled. He had decreased appetite and "sometimes" had difficulty sleeping. He reported he had taken his last pain pill the day before. He felt better if he took five (5) pills per day instead of four (4). Plaintiff rated his pain at eight (8) on a scale of one-to-ten (1-10); it decreased to three-to-four (3-4). Plaintiff did "admit to smoking marijuana." Dr. DeLanoy noted Plaintiff's chronic problems included degenerative disk disease, fatigue, depression, insomnia, chronic pain, and hypothyroidism (R. 668). Plaintiff's examination was normal, except he was positive for posterior tenderness (R. 669). Dr. DeLanoy refilled Plaintiff's prescription for Oxycodone and informed him she could not fill the prescription early. She also prescribed Cymbalta and Restoril (R. 670).

Dr. DeLanoy examined Plaintiff on February 29, 2012, due to back and leg pain. Plaintiff stated he had reported to the emergency department at City Hospital on February 25 and 28, 2012, after having been "slammed across" a police car when he "approached police car to discuss why his

son was patted down" and he "'exchanged words'" with the police officer. Plaintiff reported he was medicating with Toradol, Flexeril, and Percocet, which had been prescribed by the emergency room doctor. He had been walking with a cane. Dr. DeLanoy noted Plaintiff's chronic problems were degenerative disk disease, fatigue, depression, chronic pain, hypothyroidism, and insomnia. She noted that Plaintiff's February 25, 2012, CT scan of his lumbar spine showed a "moderate" disk bulge at L4-L5 (R. 664). Dr. Delanoy noted Plaintiff smoked less than one (1) package of cigarettes per day. His blood pressure was 146/82. Upon examination, Dr. DeLanoy found Plaintiff was in no apparent distress; his respiratory and cardiovascular systems were normal. Plaintiff's spine was positive for posterior tenderness. He had normal flexion and extension. His straight leg raising test was negative (R. 665). Dr. DeLanoy prescribed Gabapentin, Flexeril, Oxycodone, Cymbalta, and Restoril. She referred him for pain management (R. 666).

On February 29, 2012, Plaintiff was positive for Oxycodone and Benzodiazepine (R. 667).

On May 14, 2012, Plaintiff described his back pain to Dr. Yellott as "ache and shooting." Plaintiff stated he "quit" taking Flexeril due to "increased irritability." Plaintiff reported his symptoms were relieved with pain medications. When "asked for a drug screen," Plaintiff said "there might be alittle (sic) 'weed' in it" (R. 700). Dr. Yellott noted Plaintiff's February 25, 2012, CT scan showed a moderate disk bulge at L4-L5 (R. 701). Plaintiff's examination was normal, except he was positive for paresthesia, sleep disturbances, vertigo, back pain, and bone and joint symptoms (R. 702-04). He was oriented and alert; he had no motor weakness; his balance and gait were intact (R. 704). Dr. Yellott noted Plaintiff was positive for marijuana and opiates (R. 705, 729-30). Plaintiff told Dr. Yellott he had taken morphine, which was not prescribed, and Dr. Yellott noted that, in the past, Plaintiff had taken Xanax "given by neighbor." Dr. Yellott also noted

Plaintiff was able to play the drums. He "refused to give controlled med prescriptions" to Plaintiff. Dr. Yellott prescribed Cymbalta, Restoril, Gabapentin, and Oxycodone (R. 705).

It was noted, by Dr. Yellott, on May 15, 2012, that Plaintiff's flexion and extension were normal; his straight leg raising test was normal. Dr. Yellott increased Plaintiff's dosage of Neurontin and "[a]dvised [Plaintiff] that [he] could not increase oxycodone and if he [took] someone else's medication again, we [would] no longer prescribe medication" (R. 709).

On June 12, 2012, Plaintiff told Dr. DeLanoy his pain level was three (3). He had increased neck pain, but he was "doing well overall with back pain" (R. 711). Plaintiff's examinations were normal except for posterior tenderness (R. 713-14). His elevated leg test was negative; he had no paravertebral spasm. Dr. DeLanoy prescribed oxycodone, Cymbalta, Restoril, and Gabapentin (R. 714). Plaintiff was positive for Benzodiazepine, Oxycodone, and marijuana (R. 731).

On July 11, 2012, Plaintiff reported to Dr. DeLanoy that he had lost his prescription for Oxycodone and asked for a new prescription (R. 716). Plaintiff's examination was normal, except he was positive for posterior tenderness (R. 718). Dr. DeLanoy informed Plaintiff that his prescription for Oxycodone could not be filled early. Plaintiff then stated he preferred to be weaned off the medication. Dr. DeLanoy reduced Plaintiff's dosage of Oxycodone and prescribed Zanaflex and Cymbalta (R. 719).

On September 5, 2012, Plaintiff reported to Dr. DeLanoy that he had difficulty sleeping. He had vivid and violent dreams. His "[p]artners [had] noticed sleep apnea." He stated his "head ha[d] been clearer" since he had been weaned off opiates. He had some muscle aches; his back "act[ed] up"; he was shaky. Plaintiff had been treated at the emergency department at City Hospital on August 8, 2012, for a leg injury that resulted from his having fallen "through floor in apartment."

He stopped taking Gabapentin because it was not effective (R. 720). Dr. DeLanoy prescribed Cymbalta and Zanaflex (R. 723).

Plaintiff reported to Dr. DeLanoy, on January 10, 2013, that he had been taking Zanaflex; Amitriptyline caused him to behave in a negative way. He had significant back pain, but he wanted to "stay off narcotics." He was homeless (R. 724). Plaintiff was positive for back pain. His blood pressure was 150/48 (R. 726). He had posterior tenderness. His affect was normal. Dr. DeLanoy prescribed Meloxicam, Cymbalta, Zanaflex, and Ambien (R. 727).

On March 8, 2013, a therapist, Michael Hartofelis, completed a WorkWell Functional Capacity Evaluation of Plaintiff. He noted that Plaintiff's functional limitations were consistent with his physical impairments, diagnosis, and past injury. Plaintiff reported "discomfort" in his low back, right hip, and right leg. Plaintiff "demonstrated unsafe body mechanics during knee squat [and] crouching," and he had loss of balance. Mr. Hartofelis noted asymmetric movement when Plaintiff walked. At the beginning of the test, Plaintiff "exhibited smooth patterns of movements"; "however, as testing progressed his level of discomfort increased and the fluidity of his movement decreased." Plaintiff was positive for decreased range of motion and strength in his torso, right hip, cervical area, and leg. Plaintiff was limited in lifting, carrying, walking, sitting, standing, and kneeling and difficulty forward bending, kneeling, and crouching. He found Plaintiff had push/pull limitations. He stated that Plaintiff may be able to perform the duties associated with sedentary work; "however, [Plaintiff] ha[d] decreased sitting tolerance and experience[d] pain with positional changes which may make performing those duties difficult." He further opined that Plaintiff "may require vocational retraining that would allow . . . work within his limitations." Mr. Hartofelis was "unable to fully assess ability to return to work as job description was not available" (R. 747-48).

At the March 13, 2013, administrative hearing, Plaintiff testified he had gained fifteen (15) pounds due to not being able to be as active as he once had been. Plaintiff lived with a friend (R. 34). Plaintiff testified he received two-hundred dollars ($200) each month in food stamps and had a Medicaid card (R. 35-36). Plaintiff stated he could not work because his back was "completely unpredictable" (R. 40). He said he either stood or lay down because sitting was the "worst position." Plaintiff stated he had three or four (3-4) good days per week; however, he could feel "miserable" for one and one-half (1 ½) weeks. Plaintiff stated his pain, which was stabbing and burning, was in his right hip and on his right side (R. 41). Pain radiated to his left side and his legs, bilaterally. Plaintiff's pain made it appear his stomach hurt; however, there was "nothing wrong with [his] abdomen, just the pain [went] through [his] torso to that extent." Plaintiff stated he medicated his pain with Cymbalta and a muscle relaxant (R. 42). Plaintiff stated that he believed the medication helped ease his symptoms (R. 43). Even with medication, his pain level could be nine (9) on a scale of one-to-ten (1-10). Plaintiff reported his pain level, during the administrative hearing, was three (3) (R. 44). Plaintiff stated hot showers helped ease his pain (R. 45).

Plaintiff testified he could sit for twenty (20) minutes at a time (R. 45). He could stand comfortable for twenty-to-thirty (20-30) minutes. Plaintiff stated he tried to walk each day and could walk four-or-five (4-5) city blocks. Plaintiff would "avoid" lifting, but he could lift between ten and twenty (10-20) pounds. Plaintiff lay down, due to pain, "multiple times" per day for "three, five, six hours at a time" (R. 46). Plaintiff testified his back pain was exacerbated by bending and weather changes. He took care of his personal hygiene (R. 47). Plaintiff cooked twice weekly, he ate out, and he washed dishes (R. 48). Plaintiff did light dusting and sink cleaning. He did not carry

26

groceries or laundry in a basket (R. 49). Plaintiff had a valid driver's license and drove every other week. Plaintiff stated he read "a lot" during the day; he played video games four or five (4-5) hours per day (R. 50-51). Plaintiff could not longer participate in hobbies, such as scout leader, hiking, school volunteer (R. 51). Plaintiff stated he used the computer once a week, when he walked to the library. He had custody of his children every other weekend. During their visits, he played video games with them (R. 52). Plaintiff testified he experienced forgetfulness, crying spells, and remembered to take his medicine "most of the time" (R. 54).

Plaintiff testified his activities of daily living were as follows: rose at 6:00 a.m., drank coffee, smoked cigarettes if he had any, talked to his roommate, lay down, and read or played video games. Plaintiff would sit on the porch. He either lay down or stood throughout the day (R. 55). Plaintiff slept four-to-six (4-6) hours per night; he had difficulty staying asleep. He was not "usually" rested when he woke (R. 56). Plaintiff testified he had ten (10) "bad" days per month where he would be "completely down" (R. 58).

The ALJ asked the VE the following hypothetical question:

. . . [A]ssume that the individual is able to occasionally lift and/or carry including [inaudible] 20 pounds and frequently lift and/or carry including [inaudible] 10 pounds. The individual is able to stand and walk with normal breaks for a total of about six hours in an eight hour work day and sit with normal breaks for a total of six hours in an eight hour work day. However, the individual would need to be able to alternate between sitting and standing in place every half hour. The individual would be able to occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; is able to frequently balance, occasionally stoop and crouch, never kneel or crawl. The individual would need to avoid exposure to extreme cold or humidity and would need to avoid concentrated exposure to hazards including machinery. As a result of pain the individual would be limited to unskilled work or work with an SVP of no more than 2 (R. 61-62).

The VE testified the jobs of office helper, mail clerk, and cashier were available to such a

hypothetical person (R. 62-63).

The ALJ left the record open for one week so Plaintiff could provide evidence relative to his being transported, by ambulance, to the emergency department at City Hospital (R. 44-45).

Evidence Submitted after the Administrative Hearing

On March 24, 2013, Dr. Tuwiner completed a West Virginia Disability Determination Examination of Plaintiff. He reviewed an April 28, 2008, progress note written by Dr. Whyte and a September 3, 2008, letter written by Dr. Yu. Plaintiff reported back pain with radicular features. He experienced shooting pain in the buttock and numbness and tingling in his toes. Bending, stooping, and crouching exacerbated his symptoms (R. 769). Plaintiff reported arthritic symptoms in his neck and hands. Plaintiff medicated with Cymbalta, a hypertension medication, an analgesic, and a muscle relaxant. Plaintiff reported that he could perform "all ADLs" and, on a good day, he could walk five (5) blocks." Plaintiff smoked one-half (½) package of cigarettes per day and marijuana occasionally. Upon examination Dr. Tuwiner found Plaintiff's blood pressure was 140/70. His head, ears, nose, throat, lungs, abdomen, and heart examinations were normal (R. 770). Plaintiff had a normal gait and symmetrical arm swing. He could toe, heel, and tandem walk without difficulty. His Romberg test was negative. His finger-to-nose test was normal. Dr. Tuwiner found Plaintiff had normal cervical range of motion. His dorsolumbar range of motion was limited to thirty (30) degrees forward flexion. His bilateral hip, knee, ankle, shoulder, elbow, wrist, finger, and thumb joint ranges of motion were normal. Dr. Tuwiner found Plaintiff had normal tone and bulk throughout. His strength was 5/5 "in both proximal and distal extremities bilaterally." Plaintiff's reflexes were 2+ throughout. He had "[p]atchy numbness of the right foot" which was "indicative of an S1 dermatome." Dr. Tuwiner diagnosed low back pain, neck pain, hand arthralgias, and

hypertension. Dr. Tuwiner opined that Plaintiff could stand and/or walk for five (5) hours in an eight (8) hour workday. He had no limitation with sitting. He did not need the use of an assistive device. He had frequent postural limitations with stooping, bending, and crouching. He had occasional manipulation limitations with handling, feeling, grasping, reaching, pushing, and pulling, bilaterally. Plaintiff could lift approximately twenty (20) pounds both frequently and occasionally (R. 771). He could lift ten (10) pounds frequently (R. 772).

In conjunction with his disability examination of Plaintiff, Dr. Tuwiner completed a Medical Source Statement of Ability to Do Work Released Activities on March 31, 2013. Plaintiff could frequently lift and/or carry ten (10) pounds and occasionally lift twenty (20) pounds (R. 774). Dr. Tuwiner found Plaintiff could sit for eight (8) hours, stand for two (2) hours, and walk for one (1) hour at one time in an eight (8) hour workday. He could sit for eight (8) hours, stand for five (5) hours, and walk for five (5) hours total in an eight (8) hour workday. He did not require the use of a cane to aide in ambulation (R. 775). Dr. Tuwiner found Plaintiff could reach overhead and in all other directions, feel, push, and pull one-third to two-thirds (1/3-2/3) of the workday, bilaterally. He could handle and finger continuously, bilaterally He could occasionally operate foot controls, bilaterally (R. 776). Plaintiff could frequently climb stairs, ramps, ladders, and scaffolds, balance, stoop, kneel, crouch, and crawl (R. 777). He could frequently scale unprotected heights; operate moving mechanical parts; operate a motor vehicle; and be exposed to humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold and heat, and vibrations (R. 778). Dr. Tuwiner found Plaintiff could shop, travel alone, ambulate without assistance, walk a block, use public transportation, climb steps at a reasonable pace, prepare a simple meal, feed himself, care for his personal hygiene, and sort, handle, and use paper or files. Dr. Tuwiner found these limitations had

existed or would last for twelve (12) months (R. 779).

In a letter to Plaintiff's counsel, dated April 16, 2013, the ALJ acknowledged the evidence submitted after the administrative hearing; advised counsel that, if requested and the evidence did not result in a favorable decision for Plaintiff, she would grant a request for a subsequent hearing; and Plaintiff had ten (10) days from receipt of the letter to respond (R. 201-02).

Plaintiff filed a response to the additional evidence on April 29, 2013, therein requesting that the ALJ give "little or no weight" to the evidence submitted by Dr. Tuwiner. Plaintiff did not request a subsequent hearing (R. 207-09).

In the affidavit Plaintiff filed in conjunction with the response to the ALJ's letter, he did not request a subsequent hearing (R. 210-11).

### III. THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets

the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled

at one of the five steps, the process does not proceed to the next step. Id.

## IV. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's

regulations at 20 C.F.R. § 404.1520 (2000), ALJ Nunez made the following findings:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2012.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of February 13, 2009, through his date last insured of December 31, 2012 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairment: degenerative disc disease with radiculopathy (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or

combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that the claimant can stand and walk, with normal breaks, for 6 out of 8 hours in an 8-hour workday. In addition, he can sit, with normal breaks for 6 out of 8 hours in an 8-hour workday.  Moreover, he must be allowed to alternate between sitting and standing, in place, every 30 minutes.  Further, the claimant is never to be required to use ladders, ropes or scaffolds.  In addition, he is limited to only occasional use or (sic) ramps and stairs. Moreover, he is limited to no more than frequent balancing.  In addition, the claimant is limited to no more than occasional stooping and crouching. Further, he is never to be required to kneel or crawl.  Moreover, he must be allowed to avoid exposure to extreme cold and humidity.  Further, he must be allowed to avoid concentrated exposure to hazards such as machinery and h eights.  Finally, due to pain, the claimant is limited to unskilled work with an SVP of no more than two.

6.      Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on August 2, 1971 and was 41 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Through the dated (sic) last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant was not under a disability, as defined in the Social Security Act,

at any time from February 13, 2009, the alleged onset date, through December 31, 2012, the date last insured (20 CFR 404.1520(g) (R. 12-21).

## V. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays v. Sullivan, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Plaintiff contends:

1.    The ALJ's decision to reject the opinions of Plaintiff's treating physicians was not supported by substantial evidence ( Pl.'s Br. at pp. 9-10).

2.    The ALJ's decision that Plaintiff is able to perform light work with additional restrictions is not supported by substantial evidence (Pl.'s Br. at pp. 11-12).

3.    Plaintiff was denied his due process rights to a full and fair hearing because the ALJ ignored his request for a supplemental hearing (Pl.'s Br. at pp. 12-15).

The Commissioner contends:

1.    Substantial evidence supports the ALJ's reasonable analysis of Dr. Whyte and Dr. DeLanoy's opinions (Def.'s Br. at pp. 9-12).

2.    Substantial evidence supports the ALJ's RFC analysis (Def.'s Br. at pp. 12-13).

3.    The ALJ did not offend Plaintiff's rights (Def.'s Br. at pp. 13-14).

## C. Substantial Evidence Supports the ALJ's Analysis on Dr. Whyte and Dr. DeLanoy's Medical Opinions

Plaintiff first alleges that the ALJ erred in her analysis by giving "little weight to the opinions of Dr. Whyte and Dr. DeLanoy" and instead giving "weight to and partially accepting the opinions of the state agency consultants, including Dr. Tuwiner's consultative report . . ." (Pl.'s Br. at 9). Plaintiff specifically argues that because Dr. Whyte and Dr. DeLanoy are his treating physicians then their opinions should be given "great weight" (Pl.'s Br. at 9–10).

Defendant, on the other hand, argues the medical opinions were nothing more than conclusory statements that were also inconsistent with the record as a whole (Def.'s Br. at 10–12).

The regulations, specifically 20 C.F.R. § 404.1527(c), discuss how the ALJ weighs treating source medical opinions:

*How we weigh medical opinions*.  Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling

weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion

(1) *Examining relationship*. Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) *Treatment relationship*. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(I) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) *Length of the treatment relationship and the frequency of examination*. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and

testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability*. The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency*. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization*. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors*. When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it. See Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Such opinions should be accorded great weight because they "reflect[] an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir.

1983).  In <u>Craig v. Chater</u>, however, the Fourth Circuit further elaborated on this rule:

> Circuit precedent does not require that a treating physician's testimony "be given controlling weight." <u>Hunter v. Sullivan</u>, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,
>
> > [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and  laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.
>
> By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

76 F.3d 585, 590 (4th Cir. 1996). In addition, "[n]either the opinion of a treating physician nor the determination of another governmental entity are binding on the Secretary."  <u>DeLoatch v. Heckler</u>, 715 F.2d 148, 150 n.1 (4th Cir. 1983). Thus, "[t]he treating physician rule is not absolute." <u>See</u> <u>Hines v. Barnhart</u>, 453 F.3d 559, 563 n.2 (4th Cir. 2006).

Some issues are reserved specifically for the Commissioner and opinions on such issues "are never entitled to controlling weight or special significance." SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996). For example, the Commissioner is responsible for determining whether a claimant is disabled or unable to work. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). Therefore, a medical source that offers an opinion on whether an individual is disabled or unable to work "can never be entitled to controlling weight or given special significance." SSR 96-5p, 1996 WL 374183, at *5.

The Fourth Circuit has also noted that a court "cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence."  <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235 (4th Cir. 1984). An ALJ's failure to do this "approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine

whether the conclusions reached are rational.'" Arnold v. Sec'y of Health, Ed. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977) (quoting Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974)).

### 1. Dr. DeLanoy's Medical Opinion

Turning first to Dr. DeLanoy's March 2, 2011, medical opinion, the ALJ in her analysis assigned "little weight" to it for primarily two reasons: (1) the opinion was written on the first day Dr. DeLanoy treated Plaintiff; and (2) Dr. DeLanoy ruled on an issue reserved for the Commissioner (R. 19).

Plaintiff argues that Dr. DeLanoy has examined Plaintiff multiple occasions and that the ALJ failed to note persuasive contradictory evidence and therefore applied the wrongs standard (Pl.'s Br. at 10). Defendant conversely states that Dr. DeLanoy's opinion "proffered no specific functional limitations and merely conclusorily opined as to a diagnosis, coupled with a statement presumably intended to provide that Plaintiff could not work" (Def.'s Br. at 12).

On March 2, 2011, Dr. DeLanoy wrote a letter to Plaintiff's insurance company simply opining that "[Plaintiff] is unable due to chronic lumbar disc disease. He is permanently disabled" (R. 447). However, determining whether someone is disabled is an issue reserved only for Commissioner. See 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). While some might object to this seemingly "boiler plate" language, the regulations, case law, and social security policy interpretations are quite clear and straightforward on this matter: a medical source that offers an opinion on whether an individual is disabled cannot be entitled to controlling weight. See SSR 96-5p, 1996 WL 374183, at *5; Morgan v. Barnhart, 142 F.App'x 716, 723, (4th Cir. 2005) (ALJ not required to assign heightened evidentiary value to such opinions); 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). Dr. DeLanoy's opinion therefore did not have to be given controlling weight because such statement

declaring Plaintiff disabled "can never be entitled to controlling weight or given special significance." SSR 96-5p, 1996 WL 374183, at *5.

Although Dr. DeLanoy's opinion is not entitled controlling weight, the opinion may not be summarily dismissed on that basis but instead the six regulatory factors must be used to determine what weight, if any, to give it. See 20 C.F.R. § 404.1527(c)(1–6). Dr. DeLanoy's opinion contained no reasons for her conclusion that Plaintiff was disabled; it was a mere conclusory statement. While a treating physician's opinion do generally deserve some weight, this rule does not apply when the statements are brief and conclusory like Dr. DeLanoy's was here. See 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion . . . the more weight we will give that opinion); see also Perez v. Barnhard, 415 F.3d 457, 465–66 (5th Cir. 2005). Furthermore, the ALJ factored in the length of the treating relationship between Plaintiff and Dr. DeLanoy—the day Dr. DeLanoy made this diagnosis was the first time she treated the Plaintiff. See 20 C.F.R. §§ 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion").

Accordingly, after viewing all the evidence, the undersigned finds that substantial evidence supports the ALJ's decision to assign "little weight" to Dr. DeLanoy's opinion.

### 2. Dr. Whyte's Medical Opinion

Dr. Whyte's medical opinion consisted of two components: (1) return-to-work forms; and (2) a functional capacities evaluation. The ALJ here assigned both of these components "limited weight" (R.19). Regarding the return-to-work forms, the ALJ assigned them limited weight because they are inconsistent with the rest of the record and Dr. Whyte, a family practitioner, based his

opinion on an area outside his expertise. Id. Turning to the functional capacities form, the ALJ assigned it limited weight mainly because the form was only "partly consistent with the evidence as a whole . . . ." Id.

Plaintiff again argues that Dr. Whyte's opinions should be entitled some deference because he has treated Plaintiff over a long period of time and that the ALJ failed to point out contradictory evidence (Pl.'s Br. at 10). Defendant counters arguing that Dr. Whyte opined on issues reserved for the Commissioner and that his opinions were inconsistent with the record (Def.'s Br. at 10–11).

Starting with Plaintiff's return-to-work forms, Dr. Whyte simply concluded that Plaintiff was "[n]ot able to work" without any mention of specific restrictions (R. 439–40, 743–45). However, just like with Dr. DeLanoy's opinion referenced above, conclusory statements are reserved for the Commissioner and thus are not entitled controlling weight. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1); see also SSR 96-5p, 1996 WL 374183, at *5.

Turning to the six regulatory factors then because Dr. Whyte's opinion on the return-to-work forms merit no controlling weight, the ALJ noted that Dr. Whyte is not an orthopedist and made his opinion on an area outside his medical expertise (R. 19). Under the regulations, the degree of specialization is a factor that the ALJ can consider when determining what weight to afford a medical opinion. See 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her speciality than to the opinion of a source who is not a specialist). Thus, the undersigned finds there is substantial evidence to see why the ALJ assigned only "limited weight" to these return-to-work forms.

The ALJ next reviewed a functional capabilities form provided by Dr. Whyte (R. 441–44). The ALJ determined it was inconsistent with the record; the undersigned agrees. Per the rule in

Craig, "if a physician's opinion . . . is inconsistent with other substantial evidence, it should be accorded significantly less weight. Craig, 76 F.3d at 590; see also. 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give that opinion). In her findings, the ALJ noted that while the Plaintiff's treatment was not improving, the doctor subsequently ceased treatment in 2010 (R. 19). Also, the ALJ discussed how Dr. Whyte could no longer comment of Plaintiff's current restrictions; he failed to provide any type of evidence to support this opinion Id. In addition, it seemed Plaintiff was improving as his daily activities included housecleaning, driving, shopping and he testified his medication was helping his symptoms (R. 57, 162–64, 676, 678, 684, 700).

Upon reviewing the entire record, the undersigned agrees with the ALJ's assessment to explain the assignment of lesser weight to Dr. Whyte's opinions. Accordingly, substantial evidence supports the ALJ's findings.

### D. The RFC Determination is Supported by Substantial Evidence

Second, Plaintiff contends the ALJ erred when determining that he has the residual functional capacity to perform light work (Pl.'s Br. at 11). Plaintiff alleges that the limitations crafted by the ALJ "are so numerous and so broad that the limitations are persuasive evidence that [Plaintiff] cannot do light work" (Pl.'s Br. at 11).

Defendant argues, however, that the ALJ correctly formulated the hypothetical scenarios for the VE, incorporated Plaintiff's limitations when questioning the VE about what jobs were available to such people, and properly relied on the VE's answers when rendering her decision (Def.'s Br at 12–13).

Under the Social Security Act, a claimant's RFC represents the most a claimant can do in a

work setting despite the claimant's physical and mental limitations. 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1) (2011). Furthermore, a person's "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis;" that is, for "8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 21996). The Administration is required to assess a claimant's RFC based on "all the relevant evidence" in the case record." 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). Even though the Administration is responsible for assessing RFC, the claimant has the burden of proving her RFC. See Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993) (per curiam) (citing Grant v. Schweiker, 699 F.2d 189, 191 (4th Cir. 1983)) (claimant has the burden of production and proof through the fourth step of the sequential analysis); see also 20 C.F.R. §§ 404.1545(a)(3); 416.945(a)(3) (claimant is responsible for providing evidence to be used to develop RFC).

 The evaluation of a claimant's mental RFC is an assessment of his ability to perform certain mental activities, such as limitations in understanding, remembering, or carrying out instructions; or responding appropriately to supervision, co-workers, and work pressures in a work setting. 20 C.F.R. § 404.1545(c). The claimant's mental RFC is determined by evaluating evidence such as:

- History, findings, and observations from medical sources (including psychological test results), regarding the presence, frequency, and intensity of hallucinations, delusions or paranoid tendencies; depression or elation; confusion or disorientation; conversion symptoms or phobias; psychophysiological symptoms; withdrawn or bizarre behavior; anxiety or tension.

- Reports of the individual's activities of daily living and work activity, as well as testimony of third parties about the individual's performance and behavior.

- Reports from workshops, group homes, or similar assistive entities.

SSR 85-16, 1985 WL 56855, at *2 (1985). An evaluation of physical limitations involves

examining the demands of work activity "such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching." 20 C.F.R. § 404.1545(b).

The RFC assessment is a function-by-function assessment of an individual's ability to do work-related activities that represents "not the *least* an individual can do despite his or her limitations or restrictions, but the *most*." SSR 96-8p, 1996 WL 374184, at *1, 3 (July 2, 1996); see also 20 C.F.R. § 416.945(a). In making the RFC assessment, the ALJ must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, describe the maximum amount of each work-related activity the individual can perform based on the evidence in the case record, and "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996). Failure to explain inconsistencies and ambiguities between the evidence and RFC determination is grounds for remand. See Giddings v. Astrue, 333 F.App'x 649, 2009 WL 1813741, at *5 (2d Cir. 2009).

The ALJ here determined that Plaintiff has the RFC to perform light work (R. 14–15). "Light work" is defined by the CFR:

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 CFR § 404.1567(b). However, the ALJ also added certain limitations to Plaintiff's RFC:

43

the claimant can stand and walk, with normal breaks, for 6 out of 8 hours in an 8-hour workday. In addition, he can sit, with normal breaks for 6 out of 8 hours in an 8-hour workday. Moreover, he must be allowed to alternate between sitting and standing, in place, every 30 minutes. Further, the claimant is never to be required to use ladders, ropes or scaffolds. In addition, he is limited to only occasional use or (sic) ramps and stairs. Moreover, he is limited to no more than frequent balancing. In addition, the claimant is limited to no more than occasional stooping and crouching. Further, he is never to be required to kneel or crawl. Moreover, he must be allowed to avoid exposure to extreme cold and humidity. Further, he must be allowed to avoid concentrated exposure to hazards such as machinery and h eights. Finally, due to pain, the claimant is limited to unskilled work with an SVP of no more than two.

(R. 14–15). Plaintiff argues that these limitations disqualify himself from performing light work (Pl.'s Br. at 12). However, the undersigned disagrees and finds that the ALJ's RFC determination is supported by substantial evidence.

Despite Plaintiff's assertion that the limitations disqualifies him from performing light work, the ALJ, when concluding that Plaintiff could perform light work, included all those limitations in her analysis. When questioning the neutral VE, the ALJ posed a hypothetical using the same limitations:

Q: For the next hypothetical question, I'm going to ask you to further assume that the individual is able to occasionally lift and/or carry including 20 pounds and frequently lift and/or carry including 10 pounds. The individual is able to stand and walk with normal breaks for a total of about six hours in an eight hour day. However, the individual would need to be able to alternate between sitting and standing in place every hour. The individual would be able to occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; is able to frequently balance, occasionally stoop and crouch, never kneel or crawl. The individual would need to avoid exposure to extreme cold or humidity and would need to avoid concentrated exposure to hazards including machinery. As a result of pain the individual would be limited to unskilled work or work with an SVP of no more than 2.

(R. 62). After this hypothetical, the VE testified that a person with those limitations could perform certain jobs in the local or national economy (R. 62–63). Under the regulations, it is perfectly

acceptable for the ALJ to rely on VE testimony to help determine whether other work exists in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1566(e), 416.966(e). In addition, while not binding in this court, if the ALJ poses a hypothetical question that accurately reflects all of the claimant's limitations, the VE's response thereto is binding on the Commissioner. See Edwards v. Bowen, 672 F. Supp. 230, 235 (E.D. N.C. 1987). Using the VE's testimony, which was impartial and based on all available evidence, the ALJ went on to conclude that Plaintiff is not disabled (R. 21). The undersigned finds that the ALJ acted appropriately in this matter by utilizing the VE testimony and therefore finds that substantial evidence supports the ALJ's finding of no disability.

### E. Plaintiff's Due Process Rights Were Not Violated

Plaintiff's last issue involves his constitutional due process rights. Specifically, Plaintiff contends that the ALJ violated his due process rights by "ignor[ing] his request for a supplemental hearing" on the report generated by Dr. Tuwiner. (Pl.'s Br. at 12). In addition, Plaintiff further argues that he was "prejudiced" by the ALJ's failure to grant him a supplemental hearing because it removed his opportunity to subpoena and cross-examine Dr. Tuwiner on the report's findings, and offer a rebuttal to the report (Pl.'s Br. at 14). Yet, despite these allegations, the undersigned cannot even find a semblance of a "request" for an a supplemental hearing in the record and therefore must find that Plaintiff's due process rights were not violated.

Under the Social Security Administration's Hearings, Appeals and Litigation Law Manual ("HALLEX"), a claimant must have "the opportunity to examine additional evidence received after the hearing in order for the claimant to: comment on, object to, or refute the evidence by submitting other evidence; request a supplemental hearing; or if required for a full and true disclosure of the

facts, cross-examine the author(s) of the evidence." HALLEX § I-2-7-1. When proffering additional evidence to the claimant by letter, the ALJ must include certain information in it:

> A time limit to object to, comment on, or refute the proffered evidence, and to submit a written statement as to the facts and law that the claimant believes apply to the case in light of the evidence submitted; A time limit to submit written questions to the author(s) of the proffered evidence; An opportunity to exercise his or her right to request a supplemental hearing, including the opportunity to cross-examine the author(s) of any posthearing evidence; and The opportunity and a description of the procedures for requesting a subpoena to require the attendance of witnesses or the submission of records.

HALLEX § I-2-7-30(A). The HALLEX further states that "[i]f the claimant requests a supplemental hearing, the ALJ must grant the request unless the ALJ has already decided to issue a fully favorable decision." Id. at § I-2-7-30(C)(1).

Upon review of the record, the Court finds that the ALJ followed all appropriate HALLEX procedures in this case. The ALJ informed Plaintiff through two letters that Dr. Tuwiner's report was going to be entered into the record (R. 201–02, 204–05). In both of these letters to Plaintiff, all the HALLEX procedures found in Section I-2-7-30(A) were followed. More importantly, however, the ALJ clearly stated in both letters to the Plaintiff that "[i]f you *request* a supplemental hearing, I will grant the request unless I receive additional records that support a fully favorable decision" (R. 201, 204) (emphasis added).

Yet, nowhere in Plaintiff's response to the ALJ is there any type of statement that can be construed as a request for a supplemental hearing. In Plaintiff's response and attached affidavit to the ALJ, Plaintiff does discuss the perceived inconsistences and shortcomings of Dr. Tuwiner's report; yet, neither contain a statement requesting a supplemental hearing (R. 207-11). The most conclusory statement made to the ALJ in Plaintiff's response is him requesting "that little or no

weight be given to Seth Tuwiner, M.D.'s Disability Determination Examination Report (Exhibit 22F) and Medical Source Statement of Ability to Do Work-Related Activities (Physical) (Exhibit 23F)" (R. 209). This is not a request for a supplemental hearing though. Therefore, the ALJ had no duty to grant a supplemental hearing under HALLEX § I-2-7-30(C)(1) if the request was never made. Because the ALJ followed all HALLEX procedures when proffering additional evidence, Plaintiff's due process rights were not violated.

## VI. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's applications for DIB is supported by substantial evidence. I accordingly recommend the Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Judgment on the Pleadings be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Gina M. Groh, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 10th day of November, 2015.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE